# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOHN M. SIGG,

*Plaintiff,*

vs.

ALLEN COUNTY, KANSAS, BOARD OF
COUNTY COMMISSIONERS and BRYAN
J. MURPHY, Allen County Sheriff,
individually and in his official capacity,

*Defendants.*

Case No. 15-CV-01007-EFM

MITCHELL SIGG,

*Plaintiff,*

vs.

ALLEN COUNTY, KANSAS, BOARD OF
COUNTY COMMISSIONERS and BRYAN
J. MURPHY, Allen County Sheriff,
individually and in his official capacity,

*Defendants.*

Case No. 15-CV-01012-EFM

**MEMORANDUM AND ORDER**

Plaintiff John Sigg was driving at night when he was pulled over for driving with a malfunctioning head lamp.  Allen County Sheriff's Deputy Jarod Tingley issued John a citation for driving without proof of insurance.  John was reluctant to sign the citation, and words were exchanged.  The situation escalated, and Deputy Tingley pulled John out of the car and began placing John in handcuffs.  John's father, Mitchell Sigg, arrived while Deputy Tingley was handcuffing John.  Mitchell Sigg was irate, and immediately began hurling expletives at Deputy Tingley and his partner, Deputy Jason Kegler.  Deputy Tingley instructed his partner, Deputy Jason Kegler, to "cuff him," referring to Mitchell.  The father and son duo were both arrested and subsequently transported to the Allen County Jail.  John Sigg was not charged with any crimes, but Mitchell was charged with violating K.S.A. § 21-5904(a)(3)—Interference with Law Enforcement.

John Sigg filed suit on January 7, 2015, naming the Allen County Board of County Commissioners (the "Board") and Bryan Murphy, the Allen County Sheriff, as Defendants.  On January 8, Mitchell Sigg brought his own suit against the same Defendants.[1]  Both John and Mitchell assert 42 U.S.C. § 1983 claims against the Defendants.  John Sigg asserts that his Fourth and Fourteenth Amendment rights were violated.  Mitchell Sigg asserts that his First, Fourth and Fourteenth Amendments were also violated.  John and Mitchell both claim that their constitutional rights were violated by Deputy Tingley, who is not a party to this case.  Instead of seeking damages from Deputy Tingley himself, John and Mitchell claim that Sheriff Murphy and the Board are liable for the negligent supervision and retention of Deputy Tingley.

---

[1] Both John and Mitchell sued Sheriff Bryan Murphy in his individual and official capacities.

John and Mitchell's separate cases were later consolidated into this present case, Case No. 15-CV-01007.  Both Plaintiffs and both Defendants now seek summary judgment on the claims.  The Court concludes that the uncontroverted facts do not give rise to personal, supervisory, or municipal liability.  Thus, the Court grants the Defendants' motion for summary judgment (Doc. 45).  Because neither the Board nor Sheriff Murphy can be held liable in any capacity for the alleged constitutional violations, the Court denies John Sigg's motion for partial summary judgment (Doc. 41) and Mitchell Sigg's motion for partial summary judgment (Doc. 42) as moot.

# I.     Factual and Procedural Background[2]

## A. *February 2, 2013 Arrests*

On the evening of February 2, 2013, Plaintiff John Sigg was driving a vehicle from the inventory of his employer—Sigg Motors #1, LLC, a used vehicle dealership.  John was driving on Highway 54 on the east side of Iola, Kansas, in Allen County, when he was pulled over for driving with a malfunctioning headlight.  Jarod Tingley, a Deputy employed by the Allen County Sheriff's Department, performed the traffic stop.  He was accompanied by Deputy Jason Kegler.  Because Defendants entered a videotape of the traffic stop into the record, the following events are largely uncontroverted.

When Deputy Tingley approached John's vehicle, John explained to Deputy Tingley that the car he was in was a dealer vehicle.  The vehicle had a current dealer license plate properly affixed to it, which was set to expire at the end of February, 2013.  When Deputy Tingley ran the tag through Allen County Communications, the tag initially came back as expired, but the dispatcher informed Deputy Tingley that they had been having some issues with the state files.

---

[2]  In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

While Deputy Tingley was running the tag, John got out of the vehicle and confirmed that the passenger side headlight was not functioning.

Deputy Tingley then requested proof of insurance for the vehicle.   The insurance information John provided to Deputy Tingley was located on the back of the dealer's plate, and had expired before February 2, 2013.  Deputy Tingley then issued a citation for driving without proof of insurance, advising John that he "had" to issue him the ticket.[3]

After Deputy Tingley handed the dealer's plate back to John, he asked Deputy Tingley to explain the citation.  Deputy Tingley explained that the insurance showed that it expired in September, 2012, and driving without proof of insurance is a misdemeanor in the state of Kansas.

"But what I am going to have you do is, I am sure you guys have insurance on all of your vehicles, so on Monday whenever you find that insurance, or have the updated insurance information, I'm going to have you give the court a call and see if they'll just let you bring it up."

After explaining the citation to John, Deputy Tingley asked for John to sign it.  "What I need for you to do is sign by the 'x' where I have circled, by signing you are not stating that you are guilty or anything, just promising to appear in court on the 6th of March."

"You are giving me a ticket?" John asked.

Tingley answered: "Yes, man.  I don't have a choice.  The state says I have to."

John then opened the car door, but Deputy Tingley quickly shut it, telling John, "Nope, stay in the car."

After a brief delay, Tingley asked: "Are you going to sign the citation for me?"

_____

[3] Plaintiffs point out that, at this time, Deputy Tingley was unaware of the exemption contained within K.S.A. § 40-3104(m), in which vehicle dealers are exempt from the requirement to provide proof of insurance when requested to do so by a law enforcement officer.

John silently stared forward for at least five seconds before he responded: "And if I don't?"

"You're going to go to jail."

John sat in silence once again for about ten seconds.

Deputy Tingley eventually spoke up.  "Are you willing to sign the citation?"

Again, John did not immediately respond.  He continued to stare silently into the distance for about ten more seconds.

The silence was broken when Deputy Tingley told John to "Step on out."

As he attempted to open the car door, Deputy Tingley advised John that he was under arrest.

John finally spoke.  "Are kidding me, let me sign the f*cking thing."

"Nope, you're under arrest," Deputy Tingley replied.  Deputy Tingley then had John exit the vehicle and he began to place John in handcuffs.  This occurred on the driver's side of John Sigg's vehicle.

At some point during the traffic stop, John used his phone to tell his father, Plaintiff Mitchell Sigg, of the news that he had been pulled over.  For reasons unknown, Mitchell Sigg decided to drive to the scene.  He arrived while Deputy Tingley was still placing John Sigg in handcuffs, parking his car immediately behind the Deputies' vehicle on the side of the road.

Upon exiting his vehicle, Mitchell began approaching the Deputies.

"What the f*ck are you doing idiot?  What the f*ck are you doing?" he yelled directly at Deputy Tingley.  As he was doing so, he kept advancing towards Deputy Tingley, who was still occupied with handcuffing John.

Deputy Kegler, who was riding with Deputy Tingley that evening, physically blocked Mitchell from getting any closer.  To give reference to how close Mitchell was able to get, Mitchell had made contact with the trunk of John's vehicle before he was pushed to the side by Deputy Kegler.  At that time, John was standing in front of the rear tire well on the driver's side of the vehicle, and Deputy Tingley was immediately behind him, still working on securing the handcuffs.

Right when Mitchell made contact with John's vehicle, Deputy Tingley instructed Deputy Kegler to "cuff him, cuff him," referring to Mitchell.

"No, you dumb mother f*cker," Mitchell responded.

Mitchell then turned to Deputy Kegler.  "Hey stupid, get your f*cking hands off me boy.  Boy.  Yeah I know who you are, you don't f*ck with me."

After that statement, Deputy Tingley again instructed Deputy Kegler to "cuff him, he's going to jail."  Deputy Kegler then began to place Mitchell in handcuffs.  While being placed in handcuffs, Mitchell addressed Deputy Tingley, asking: "What the f*ck is your name, boy?"

John and Mitchell were then transported to the Allen County Jail where they were booked.  Afterwards, Deputy Tingley was advised by Trooper Hines of the Kansas Highway Patrol of the exemption to the proof of insurance statute for dealer vehicles.  Up until that point, Deputy Tingley had no knowledge of the exemption contained within K.S.A. § 40-3104(m).

After all was said and done, Mitchell was the only Sigg to be charged with a crime.  He was charged with violating K.S.A. § 21-5904a(a)(3)—Interference with Law Enforcement in the Discharge of an Official Duty.[4]  Despite his arrest, John was not charged with a crime arising from the February 2, 2013 traffic stop.

---

[4] Mitchell Sigg was originally charged on March 4, 2013, in Allen County, Kansas District Court.  He was charged in the Complaint/Information with Attempted Interference with Law Enforcement in Count 1 and

### B.  *Deputy Tingley's Employment History*

After completing the requisite 560 hours of training, Deputy Tingley graudated from the Kansas Law Enforcement Full-Time Officer Basic Training Program on October 8, 2010.  In the following year, he completed forty hours or more of law enforcement education or training in subjects relating directly to law enforcement.

Prior to working for the Allen County Sheriff's Department, Deputy Tingley had been employed by the Liberal Police Department for about eighteen months.  He was terminated from the Liberal Police Department with no reason given but it was rumored that he had been released because he had applied for employment with the Seward County Sheriff.  He applied for employment with the Allen County Sheriff on May 10, 2012.  His Allen County Sheriff's Department application was supported by reference letters, including from Robert Buchanan and Lt. Daniel Yorio, both who had worked with Tingley at the Liberal Police Department.

Bryan Murphy, undersheriff at the time, performed a background check of Deputy Tingley which included contacting the two Liberal officers who were listed as references and a former Liberal officer who was then with the KBI.  Approximately five individuals who had worked with Deputy Tingley at the Liberal Police Department were contacted.  Apparently, one unnamed person contacted during the preemployment screening was hesitant to recommend Deputy Tingley for employment.  However, Bryan Murphy did not follow up on that hesitancy.  Neither Allen Sill, Chief of Police for the Liberal Police Department, nor Captain John McCord,

---

Disorderly Conduct in Count 2.  An Amended Complaint/Information was then filed amending the Attempted Interference charge to Interference with Law Enforcement on July 29, 2013.  Subsequently, on March 4, 2014, a Second Amended Complaint/Information was filed amending the Interference charge to Interference with Law Enforcement, or in the alternative, Attempted Interference with Law Enforcement.  On April 2, 2014, the State of Kansas dismissed Count 1, the Interferece charge, and Alternative Count 1, the Attempted Interference charge.  A Third Amended Complaint/Information was filed on Jaunary 13, 2015, charging only Disorderly Conduct, and the case proceeded to jury trial on that charge.  On January 14, 2015, Mitchell Sigg was acquitted of the Disorderly Conduct charge by the jury.

Tingley's supervisor at Liberal, were ever contacted prior to the hiring of Deputy Tingley. They were never asked about Deputy Tingley's employment record or the basis for his involuntary termination from the Liberal Police Department. Bryan Murphy also did not obtain Deputy Tingley's personnel file from Liberal.

Tingley was hired as a deputy by former Sheriff Tom Williams effective June 11, 2012. After he was hired, Deputy Tingley was provided a copy of the Allen County Sheriff's policies and participated in field training for 30 days with an experienced officer. These policies included an arrest policy which requires either probable cause or a warrant to arrest and a policy on traffic stops. Deputy Tingley's training also included learning geography and how the Allen County Sheriff's Office works. However, Deputy Tingley was not tested on Department policies and procedures and the Department does not conduct performance reviews of its deputies.

Prior to the February 2, 2013 arrests of John and Mitchell Sigg, only one citizen complaint had been received about Deputy Tingley. Tingley had performed a traffic stop on a vehicle that had been reported as stolen. The citizen complained because the stop had been performed as a felony traffic stop.

### C. Procedural History

On January 7, 2015, John Sigg filed suit against the Allen County Board of County Commissioners and Bryan Murphy, the Allen County Sheriff, alleging that his Fourth and Fourteenth Amendment rights were violated as a result of the negligent supervision and retention of Deputy Tingley.[5] On January 8, 2015, Mitchell Sigg filed suit against the same Defendants alleging that his First, Fourth and Fourteenth Amendments were violated as a result of the

---

[5] Case No. 15-CV-01007-EFM-GEB.

negligent supervision and retention of Deputy Tingley.[6]  Both John and Mitchell are pursuing their claims under 42 U.S.C. § 1983.  On October 5, 2015, Magistrate Judge Birzer ordered that the two cases be consolidated, designating John Sigg's case, Case No. 15-1007-EFM as the lead case.

Both Plaintiffs and both Defendants now seek summary judgment on these claims.  John Sigg is seeking summary judgment on his claim that his "civil rights under the Fourth Amendment to the United States Constitution were violated" by Deputy Tingley.  Mitchell Sigg is seeking summary judgment on claim that his civil rights under the First and Fourth Amendments to the United States Constitution were violated by Deputy Tingley.  Defendants contend that Deputy Tingley's actions did not amount to constitutional violations.  In addition, Defendants argue that neither the Board nor Sheriff Murphy can be held liable for the actions of Deputy Tingley even if he did violate their constitutional rights.[7]  Thus, Defendants' motion for summary judgment seeks to dispose of all claims asserted by John and Mitchell Sigg.

## II.    Legal Standard and Claims

### A.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[8]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the

---

[6] Case No. 15-CV-01012-EFM-TJJ.

[7] The Board and Sheriff Murphy argue that John and Mitchell Sigg are unable to support any claims under the Fourteenth Amendment.  In their response, John and Mitchell Sigg both agreed that the Fourteenth Amendment was inapplicable to this case.  Accordingly, the Court will grant summary judgment with regard to all claims under the Fourteenth Amendment.

[8] Fed. R. Civ. P. 56(a).

proffered evidence permits a reasonable jury to decide the issue in either party's favor.[9]   The movant bears the initial burden of proof and must show the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[10]   If the movant carries this initial burden, the nonmovant that bears the burden of persuasion at trial may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[11]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[12]   The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[13]   When both parties file cross motions for summary judgment, the court must consider each motion separately and apply the facts in a light most favorable to the nonmovant.[14]

### B.  Parties' Arguments

Plaintiffs' motions for partial summary judgment encompass one narrow issue each. John Sigg is seeking summary judgment "on his claim that his civil rights under the Fourth Amendment to the United States Constitution were violated" by Deputy Tingley.   Similarly, Mitchell Sigg is also seeking summary judgment "on his claim that his civil rights under the First

---

[9] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.").

[10] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[11] *Id.* (citing Fed. R. Civ. P. 56(e)).

[12] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[13] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[14] *Stewart v. NationaLease of Kan. City, Inc.*, 920 F. Supp. 1188, 1202 (D. Kan. 1996) (citing *Chaparro v. IBP, Inc.*, 873 F. Supp. 1465, 1471 (D. Kan. 1995); *Federated Mut. Ins. Co. v. Botkin Grain Co.*, 856 F. Supp. 607, 615 (D. Kan. 1994)).

and Fourth Amendments to the United States Constitution were violated" by Deputy Tingley. John and Mitchell Sigg are not seeking summary judgment on their entire § 1983 claims.

Both Defendants are seeking summary judgment on a number of different grounds.  Most notably, both Defendants assert that the evidence does not support a claim under *Monell v. Department of Social Services*,[15] thus there can be no liability for Deputy Tingley's alleged constitutional violations (actions which they contend did not amount to unconstitutional conduct).  Additionally, Sheriff Murphy argues that he is entitled to qualified immunity for the claims against him in his individual capacity.

The Court will first address the threshold issue raised by Defendants—whether Sheriff Murphy and/or the Board can be held liable for the alleged unconstitutional acts of Deputy Tingley.  "In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must show that the supervisor's subordinates violated the constitution."[16]  The plaintiff must then show an "affirmative link" between the supervisor and the constitutional violation committed by a subordinate.[17]  To establish an "affirmative link" between a supervisor and subordinate, Plaintiffs must show that Sheriff Murphy and/or the Board acted with the requisite state of mind—deliberate indifference.[18]  Because the Court concludes that no reasonable jury could find either Sheriff Murphy or the Board acted with deliberate indifference towards Plaintiffs' constitutional rights in hiring, training, or supervising Deputy Tingley, Defendants cannot be held liable for Deputy Tingley's conduct.

---

[15] 436 U.S. 658 (1978).

[16] *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006).

[17] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

[18] *Id.*

Accordingly, the issues raised by Plaintiffs in their respective motions—whether Deputy Tingley did in fact violate their constitutional rights—are moot.  Deputy Tingley is not a party to this case, and is unable to defend his actions.  The Court will not rule on whether Deputy Tingley violated John or Mitchell Sigg's constitutional rights when Defendants cannot be held liable even if Deputy Tingley's actions did amount to constitutional violations.

### III.    Defendants' Motions for Summary Judgment

John and Mitchell Sigg brought their claims under § 1983 alleging that Deputy Tingley violated their constitutional rights[19] and that the Board and Sheriff Murphy are liable for those violations because (a) Deputy Tingley should not have been hired, and while employed Deputy Tingley was (b) insufficiently trained and (c) insufficiently supervised.

The Board and Sheriff Murphy advance four joint arguments for why this Court should grant their motion for summary judgment.  First, both Defendants argue that the evidence will not support a claim for alleged deliberate indifference in hiring, supervising and training the alleged constitutional tortfeasor, Deputy Tingley.[20]  Second, there was probable cause to arrest John Sigg.  Third, there was probable cause to arrest Mitchell Sigg.  Fourth, Mitchell Sigg cannot establish a First Amendment retaliatory arrest claim.

Finally, the Defendants each made one separate argument for why the Court should dismiss them from the case individually.  The Board argues that it should be dismissed because, by law, it is not the employer of Deputy Tingley.  Sheriff Murphy argues that he is entitled to

---

[19] As mentioned above, John Sigg is pursuing his claim under the theory that his Fourth Amendment rights were violated.  Mitchell Sigg is pursuing his claim under the theory that his First and Fourth Amendment rights were violated.

[20] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978) (establishing standard under § 1983 for when a municipality may be held liable for the unconstitutional acts of its employee(s)).

qualified immunity for the claims against him in his individual capacity.  The Court will first address each of the arguments that apply to both Defendants equally.

### A. *Monell* Claim for Alleged Deliberate Indifference in Hiring, Supervising, and Training

The Board and Sheriff Murphy first argue that the Siggs have failed to satisfy the requirements for municipal and supervisory liability as set forth in *Monell v. Department of Social Services*.[21]  They maintain that Sheriff Murphy did not act with deliberate indifference while hiring, training, and supervising Deputy Tingley.  More specifically, Defendants argue that Sheriff Murphy sufficiently vetted Deputy Tingley by speaking with former colleagues and verifying with the State of Kansas that he had the proper training and qualifications to work as a law enforcement officer.   At the very least, Defendants argue, Sheriff Murphy's decision to hire Deputy Tingley, and his subsequent failure to provide additional, specific training on First and Fourth Amendment issues, did not amount to deliberate indifference.

The Siggs believe that the evidence will support a claim against Defendants for "the negligent supervision, training and retention of Deputy Jarod Tingley."  They contend that Deputy Tingley had a documented history of misconduct while employed with the Liberal Police Department, making it foreseeable that he was likely to commit constitutional violations.  The Board and Sheriff Murphy should have learned of the risk, but Sheriff Murphy did not obtain Tingley's personnel record or otherwise contact Tingley's former supervisors.  Thus, by hiring Deputy Tingley and subsequently neglecting to give him additional training, the Board and Sheriff Murphy were deliberately indifferent to John and Mitchell's constitutional rights.  The Court disagrees.  For the following reasons, the Court concludes that there is no evidence which

---

[21] 436 U.S. 658 (1978).

would show the Board and Sheriff Murphy acted with deliberate indifference with respect to the Siggs' constitutional rights.

As an initial matter, the Court notes that the parties appear to be confused about the distinctions between the various theories of § 1983 liability for supervisors and municipalities. John and Mitchell Sigg have sued Sheriff Murphy in his individual capacity as well as in his official capacity.  Under § 1983, a defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability.[22]  Personal liability "under § 1983 must be based on personal involvement in the alleged constitutional violation."[23]  On the other hand, supervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes the plaintiff to be subjected to the deprivation of any rights secured by the Constitution.[24]  It is undisputed that Sheriff Murphy had no direct participation in the arrests of John and Mitchell Sigg. Accordingly, the Plaintiffs cannot point to Sheriff Murphy's personal involvement to support § 1983 liability.  Thus, the Court will only analyze whether Sheriff Murphy, in his individual capacity, may be subject to supervisory liability.

Regarding Sheriff Murphy's liability in his official capacity, the Court notes that "a suit against [Sheriff Murphy] in his official capacity as sheriff is the equivalent of a suit against [the Allen County Board of County Commissioners].[25]  Since *Monell*, the Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*," but

---

[22] *Bruner-McMahon v. Hinshaw*, 846 F. Supp. 2d 1177, 1198–99 (D. Kan. 2012).

[23] *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)).

[24] *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

[25] *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999); *see also Myers v. Ok. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998).

nonetheless has imposed liability upon municipalities when the enforcement of their policies or customs by their employees causes a deprivation of a person's federally protected rights.[26]  This is known as municipal liability.

Accordingly, the Court will first analyze Sheriff Murphy's liability in his individual capacity under the doctrine of supervisory liability.  The Court will then address the Board's liability and Sheriff Murphy's liability in his official capacity under the doctrine of municipal liability.

### 1.  Individual Supervisory Liability Under § 1983

Sheriff Murphy was Deputy Tingley's supervisor.  Courts often refer to claims against supervisors as based on "supervisory liability," though this label can be misunderstood as implying vicarious liability.[27]  "Section 1983 does not authorize liability under a theory of *respondeat superior*."[28]  For this reason, the Supreme Court has suggested the term "supervisory liability" to be "a misnomer."[29]  "Absent vicarious liability, each Governmental official, his or her title notwithstanding, is only liable for his or her own misconduct."[30]

"In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must show that the supervisor's subordinates violated the constitution."[31]  The plaintiff must then show an "affirmative link" between the supervisor and

---

[26] *Bd. of Cty. Comm'rs of Bryan Cty., Ok. v. Brown*, 520 U.S. 397, 403 (1997).

[27] *Schneider*, 717 F.3d at 767.

[28] *Montoya*, 662 F.3d at 1164; *see also Gagan v. Norton*, 35 F.3d 1473, 1476 n.4 (10th Cir. 1994) (citing *Monell*, 436 U.S. 658)); *Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) ("[A] supervisory relationship alone is insufficient for liability under § 1983 . . . .").

[29] *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

[30] *Id.*

[31] *Serna*, 455 F.3d at 1151.

the constitutional violation committed by a subordinate.[32]   This requires more than "a supervisor's mere knowledge of his subordinate's" conduct.[33]   The "affirmative link" requirement is embodied in three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement, (2) causation, and (3) state of mind.[34]

Assuming, without deciding, that Deputy Tingley violated the Siggs' constitutional rights, the Court concludes that there is no evidence by which a reasonable jury could find that there was an affirmative link between Sheriff Murphy and/or the Board and Deputy Tingley's alleged constitutional violations.

a.   Personal Involvement

The "personal involvement" element of supervisory liability is currently in a state of flux.[35]   In the Tenth Circuit prior to *Ashcroft v. Iqbal*,[36] a plaintiff could establish the first element—the defendant-supervisor's personal involvement—"by demonstrating his 'personal participation, his exercise of control or direction, or his failure to supervise,' or his 'knowledge of the violation and acquiesce[nce] in its continuance.' "[37]

---

[32] *Schneider*, 717 F.3d at 767.

[33] *Id.*; *see also Iqbal*, 556 U.S. at 677.

[34] *Schneider*, 717 F.3d at 767.

[35] *See id.* at 768 ("[W]e have not yet had occasion to determine what allegations of personal involvement . . . meet *Iqbal*'s stricter liability standard.  We have discussed this in several recent cases.  None of those cases, however, presented us with the occasion to address the precise contours of this standard.  And neither does this case.") (internal citations omitted).  For more Tenth Circuit cases discussing, but not deciding the personal involvement issue, see generally *Wilson v. Montano*, 715 F.3d 847 (10th Cir. 2013); *Keith v. Koerner*, 707 F.3d 1185 (10th Cir. 2013); *Montoya*, 662 F.3d 1152; *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

[36] 556 U.S. 662 (2009).

[37] *Dodds*, 614 F.3d at 1195 (citing *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)).

"But then, as the saying will surely go, came Iqbal."[38]   Justice Kennedy, writing for the Supreme Court, reaffirmed the notion that "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."[39]   The Court went on to declare "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[40]   In other words, when a plaintiff sues an official under § 1983 for "conduct 'arising from his or her superintendent responsibilities,' the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well."[41]

This aspect of *Iqbal* has spurred much debate concerning what impact, if any, the opinion has on the doctrine of supervisory liability under § 1983.[42]   Unfortunately, the Tenth Circuit has not clearly articulated a post-*Iqbal* standard for the first element of personal involvement.[43]   Pre-*Iqbal*, the Tenth Circuit allowed a plaintiff to establish personal involvement in several ways, for example, "by demonstrating [a defendant's] personal participation, his exercise of control or

---

[38] *Id.*

[39] *Iqbal*, 556 U.S. at 676 (citing *Monell*, 436 U.S. at 691).

[40] *Id.*

[41] *Dodds*, 614 F.3d at 1198 (quoting *Iqbal*, 556 U.S. at 676).

[42] *See, e.g., Iqbal*, 556 U.S. at 1957 (Souter, J., dissenting) (opining that the majority opinion in *Iqbal* did not merely narrow, but rather eliminated supervisory liability altogether); *Lewis v. Tripp*, 604 F.3d 1221, 1227 n.3 (10th Cir. 2010) (acknowledging that *Iqbal* may have changed the § 1983 supervisory liability landscape); *al-Kidd v. Ashcroft*, 580 F.3d 949, 976 n.25 (9th Cir. 2009), *reversed and remanded on other grounds* 1563 U.S. 731 (2011) (acknowledging that the "knowing failure to act" standard for supervisory liability may not have survived the *Iqbal* decision).

[43] *See Dodds*, 614 F.3d at 1199 ("While *Iqbal* may very well have abrogated §1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case, we do not believe it altered the Supreme Court's previously enunciated §1983 causation and personal involvement analysis); *Schneider*, 717 F.3d at 768.

direction, or his failure to supervise."[44]   "A defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement."[45]

According to the Tenth Circuit, however, *Iqbal* "articulated a stricter liability standard for this first element of personal involvement."[46]  Yet the precise contours of this standard are still unclear.  In *Schneider v. City of Grand Junction Police Department*,[47] the Tenth Circuit noted:

> [W]e have not yet had occasion to determine what allegations of personal involvement . . . meet Iqbal's stricter liability standard.  We have discussed this question in several recent cases.  None of those cases, however, presented us with the occasion to address the precise contours of this standard.  And neither does this case.  None of the claims against the individual defendants turns on the question of personal involvement.

Without knowing the stricter liability standard for the first element of personal involvement, the Court will apply the law in the light most favorable to the non-moving party. Under this standard, the uncontroverted facts sufficiently demonstrate Sheriff Murphy's personal involvement.[48]   In reaching this decision, the Court notes that the uncontroverted facts demonstrate that Sheriff Murphy was personally involved in the hiring process of Deputy Tingley.  The Court concludes from the uncontroverted evidence that this satisfies the "personal

---

[44] *Dodds*, 614 F.3d at 1195 (internal quotation marks omitted).

[45] *Id.* (citing *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988)).

[46] *Schneider*, 717 F.3d at 768 (citing *Dodds*, 614 F.3d at 1199).

[47] 717 F.3d 760, 767 (10th Cir. 2013).

[48] To complicate matters further, supervisory liability can still be found in cases where there is no overt personal involvement in the offensive act, particularly where the charge is that the supervisor "caused the deprivation" by failing to supervise or train subordinates.  *See* Ivan E. Bodensteiner & Rosalie Berger Levinson, *1 State & Local Gov't Civil Rights Liability* § 1.5 (2016).  Additionally, decisions from this District and the Tenth Circuit typically do not address the "personal involvement" element when ruling on issues of supervisory liability. *See, e.g.*, *Schneider*, 717 F.3d at 768 ("The district court's summary judgment conclusions were based on the second and third elements, causation and state of mind, and the parties' arguments also are focused on these latter elements. We therefore assume without deciding that [plaintiff] has presented sufficient evidence of the individual defendants' personal involvement under *Iqbal*'s stricter liability standard.").

involvement" element with regards to the claim of failure to properly hire Deputy Tingley. Additionally, Sheriff Murphy was Deputy Tingley's supervisor, and it appears that Sheriff Murphy was the final decision maker with regards to training within the Sheriff's Department. These facts satisfy the "personal involvement" element with regards to the claims of failure to train and failure to supervise.

b. Causation

The second element "requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation" by setting "in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."[49]  For example, in *Poolaw v. Marcantel*,[50] a plaintiff brought a § 1983 claim against two police supervisors involving a police search of the plaintiff's home.[51]  The Tenth Circuit determined that the search was not supported by probable cause and therefore violated plaintiff's Fourth Amendment rights.[52]  The police supervisors were not present during the search, but they ordered the search and swore out the affidavit in support of the search warrant.[53]  The *Poolaw* Court concluded that the supervisors' actions "set in motion a series of events" they reasonably should have known would result in the search."[54]  The plaintiff therefore satisfied the causation element for summary judgment purposes.[55]

---

[49] *Dodds*, 614 F.3d at 1185.

[50] 565 F.3d 721 (10th Cir. 2009).

[51] *Id.* at 726–27.

[52] *Id.* at 732.

[53] *Id.* at 733.

[54] *Id.*

[55] *Id.*

While neither party meaningfully addressed causation, the Court concludes that the causation element has not been satisfied.  As explained in more detail below, there is no credible evidence by which Plaintiffs could use to satisfy the final element—state of mind.  More specifically, the uncontroverted facts demonstrate that Sheriff Murphy acted reasonably in the hiring, training, and supervision of Deputy Tingley.  As such, there is no evidence by which a reasonable jury could find that Sheriff Murphy set in motion a series of events that he "knew or reasonably should have known" would cause Deputy Tingley to deprive the Siggs' of their constitutional rights.

   c.   State of Mind

In addition to failing to satisfy causation, Plaintiffs are unable to satisfy the final element—state of mind.  The third element requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind.[56]  Precisely what state of mind is required for individual liability depends on the type of claim the plaintiff brings.[57]  In *City of Canton v. Harris*,[58] the Supreme Court held "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[59]  After *Canton*, "deliberate indifference or reckless disregard" became the primary governing standard for supervisory liability.[60]  Accordingly, the Court will analyze the evidence to determine whether there are any facts which

---

[56] *Schneider*, 717 F.3d at 769.

[57] *Id.* (quoting *Iqbal*, 556 U.S. at 676; *Dodds*, 614 F.3d at 1204–05).

[58] 489 U.S. 378 (1989).

[59] *Id.* at 388.

[60] *Dodds*, 614 F.3d at 1196 n.4 (citing 1 Sheldon Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* § 3:100 (4th ed. 1997 & Supp. 2009)); *see also Woodward*, 977 F.2d at 1399 n.11 (explaining that after *Canton's* "explicit holding . . . of a scienter requirement for § 1983 liability" a plaintiff must establish supervisory liability by alleging more than gross negligence by demonstrating "an intentional, conscious, and deliberate act by the defendant participating in, or knowingly acquiescing in, the unconstitutional behavior . . . .").

could reasonably show that Sheriff Murphy's hiring decision, supervision, and training of Deputy Tingley amounted to deliberate indifference to the Siggs' constitutional rights.

In *Board of County Commissioners of Bryan County v. Brown*,[61] the Supreme Court discussed the standards for evaluating whether a policymaker's hiring decision reflects deliberate indifference:

> A plaintiff must demonstrate that [a policymaker's] decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."[62]

Additionally, the Supreme Court held, "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict a constitutional injury." Rather, a court must find that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff."[63]  "The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong."[64]

(i)    Hiring

Plaintiffs point to a number of facts in the record to support their theory that Sheriff Murphy was deliberately indifferent to their constitutional rights in hiring Deputy Tingley.  To begin, Plaintiffs allege that Sheriff Murphy was responsible for the hiring decision.  They note

---

[61] 520 U.S. 397 (1997).

[62] *Id.* at 411.

[63] *Id.* at 412 (emphasis in original).

[64] *Id.*

that Sheriff Murphy "was personally involved, while serving as Undersheriff for Allen County, in the hiring process and background check" on Deputy Tingley.

Next, Plaintiffs point to facts suggesting that Deputy Tingley was highly likely to inflict constitutional injuries on those who he came in contact with on the job. For example, during the employment screening, "one unnamed person contacted . . . was hesitant to recommend" Deputy Tingley for employment, but Sheriff Murphy failed to follow up with that person. Additionally, Plaintiffs note that Deputy Tingley was involuntarily terminated from his previous job with the Liberal Police Department. Yet Sheriff Murphy did not contact the Liberal Police Chief, request Deputy Tingley's personnel file, or otherwise address any of the issues relating to Deputy Tingley's termination.

The "issues" Plaintiffs refer to "included Deputy Jarod Tingley's use of excessive speed while on duty in his patrol vehicle, his misuse of his authority and abuse of his authority, and his inability to explain why certain arrests were necessary." In one specific incident, Deputy Tingley had an "interaction with an individual yelling profanities, where, when the man did not immediately comply with Deputy Tingley's direction to move back, he was placed under arrest." Afterwards, Deputy Tingley "was unable to satisfactorily explain to his supervisors why an arrest was necessary." On another occasion, Deputy Tingley "threatened to arrest the manager of a business whose entrance Tingley was blocking with a traffic stop when the manager politely asked if Tingley could move to allow traffic to enter the business."

Furthermore, Plaintiffs assert that Deputy Tingley "also had issues regarding the operation of his patrol vehicle while with Liberal." "These included excessive speed, and a collision with a school building in his patrol car under normal circumstances, for which he was issued a written reprimand." And later, while employed with Allen County, Deputy Tingley

"had an accident in his patrol vehicle, an incident for which Jerry Daniels [former Undersheriff for Allen County] recommended placing a written reprimand in Tingley's file."

Plaintiffs particularly emphasize a Liberal Police Department Memo dated November 18, 2011.  The memorandum, written by Deputy Tingley's supervisor, found some of his actions to be "an absolute abuse of Officer Tingley's authority as a police officer and was a complete lack of good judgment on his part."  The supervisor concluded that Tingley's actions demonstrated "a pattern of Officer Tingley's desire for authority and the abuse of that authority.  Officer Tingley has shown a lack of proper judgment and discretion and has exceeded the authority granted him through this office to enforce the law in a reasonable and just manner."  Perhaps most notably, Plaintiffs contend, the Liberal Police Department's Separation Statement stated that Deputy Tingley was "unable to perform adequately in his job" as a law enforcement officer.

Sheriff Murphy replies that "the record of an applicant must establish a propensity to commit a violation of the same constitutional rights of which the plaintiff complains or there will be an inadequate causal relationship to establish the requisite deliberate indifference to a plaintiff's involved federally protected right."  With regards to the incidents outlined in the memorandum, Sheriff Murphy believes it implies the Liberal Police Department was "more concerned with public relations than law enforcement."  With respect to Officer Tingley's arrest of the man yelling profanities and the business manager threatened with arrest, the narratives "suggest only that Tingley did not allow interference with performance of his duties, not that he would arrest either without probable cause or for protected speech."  Officer Tingley arrested the "hostile, intoxicated man yelling obscenities only after he failed to move back after he had 'got too close.' "  Sheriff Murphy also points out that Tingley did not arrest the business manager who complied with instructions to cease interfering with a traffic stop.

Finally, Sheriff Murphy argues for the first time in the Reply in Support of Defendants' Motion for Summary Judgment that two documents Plaintiffs rely on are not admissible into evidence: the Liberal Police Department Memo and the Department's response to Officer Tingley's unemployment compensation claim. He contends that both documents contain inadmissible hearsay and multiple hearsay, and no affidavit is provided to support any of the allegations. Plaintiffs did not respond to this argument.

After careful consideration, the Court concludes that the uncontroverted facts do not show Sheriff Murphy acted with deliberate indifference to the Siggs' constitutional rights when screening and eventually hiring Deputy Tingley. This is true even when considering the allegations detailed in the Liberal Police Department's Memorandum and response to the unemployment compensation claim.[65]

The record shows that Bryan Murphy took a number of reasonable steps in screening Jarod Tingley prior to hiring him.[66] During the screening process, Undersheriff Murphy performed a background check which included contacting both Liberal Police Officers who were listed as references as well as a former Liberal officer who was then with the KBI. Deputy Tingley's application was supported by reference letters from colleagues who had worked with Tingley at the Liberal Police Department. Sheriff Murphy discussed Deputy Tingley with all three listed references as well as two additional persons. Additionally, Sheriff Murphy obtained

---

[65] Because Plaintiffs' have no evidence that would allow a reasonable jury to find deliberate indifference—even while considering these two documents—the Court need not decide whether the documents would be admissible.

[66] While not addressed by either party, it appears that Sheriff Murphy was not even the "policymaker" responsible for the hiring decision. When Deputy Tingley was hired, Bryan Murphy was serving as Undersheriff for Allen County. The sheriff at the time, Tom Williams, was likely the individual responsible for making the final decision to hire Deputy Tingley. However, for the sake of argument, the Court will assume that Sheriff Murphy was responsible for hiring Deputy Tingley.

Deputy Tingley's "C-Post records,"[67] which did not state a reason for Deputy Tingley's termination. The C-Post records did show, however, that Deputy Tingley had received the necessary training and was otherwise qualified to serve as a law enforcement officer in the State of Kansas.

Plaintiffs cite no authority, either binding or persuasive, to support their assertions that Sheriff Murphy should have obtained the personnel record from the Liberal Police Department and followed up with Deputy Tingley's former supervisors. The Court was also unable to find any authority for the proposition either. Likewise, there is no evidence in the record that Sheriff Murphy's actions deviated from any protocol or policy regarding hiring decisions. Accordingly, the Court concludes that the evidence proves Sheriff Murphy's background investigation and screening process was adequate.

Next, the uncontroverted facts regarding Deputy Tingley's employment with the Liberal Police Department do not show that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff."[68] Plaintiffs are unable to point to any definitive record of Deputy Tingley having violated an individual's First or Fourth Amendment rights. The two most relevant incidents in Deputy Tingley's employment history concern the arrest of the man who approached a traffic stop and a business manager who was threatened with arrest if he did not leave the scene of a traffic stop. However, these events were not litigated, and it does not appear that any complaints were even filed. Plaintiffs' inference that Deputy Tingley violated these individuals' constitutional rights is nothing more than speculation. The other incidents Plaintiffs

---

[67] The Kansas Commission on Peace Officers' Standards and Training maintains a central registry of all Kansas police officers to serve as "a resource for all agencies who appoint or elect police or law enforcement officers to use when reviewing employment applications of such officers." K.S.A. § 74-5611a. Kansas state law mandates that every agency head shall include a report explaining the circumstances under which an officer resigned or was terminated. *Id.*

[68] *Brown*, 520 U.S. at 412 (emphasis in original).

point to do not suggest that Deputy Tingley would be likely to inflict the particular injuries allegedly suffered by Plaintiffs, as they involve Deputy Tingley's operation of his patrol car. A poor driving record does not support the inference that the officer would be likely to infringe on individuals' First or Fourth Amendment rights.

Furthermore, a thorough review of Deputy Tingley's history as a police officer does not show any evidence suggesting that he was "highly likely" to violate Plaintiffs' First or Fourth Amendment rights. "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the *plainly obvious* consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.' "[69] The evidence shows that, even if Sheriff Murphy had full knowledge of Deputy Tingley's entire employment history, the plainly obvious consequence of hiring Deputy Tingley would not be a high risk of constitutional violations. Without definitive evidence of at least one past constitutional abuse, it would not be "plainly obvious" to Sheriff Murphy that the consequence of hiring Deputy Tingley would be the deprivation of John and Mitchell Sigg's federally protected rights.[70]

While Sheriff Murphy could have vetted Deputy Tingley more thoroughly, the evidence simply does not show that his actions rose to the level of deliberate indifference. "This is a difficult standard to meet, as 'deliberate indifference' requires a higher degree of fault than

---

[69] *Id.* at 411 (emphasis added).

[70] *See Brown*, 520 U.S. at 414–15 (holding applicant's pleas of guilty to various traffic violations and assault and battery, resisting arrest, and public drunkenness did not make use of excessive force a plainly obvious consequence of decision to hire him as a police officer).

negligence, or even gross negligence."[71]   Viewing the uncontroverted facts in the light most favorable to Plaintiffs, no reasonable jury could conclude that Sheriff Murphy's actions rose to that high standard.

Accordingly, the Court concludes that no reasonable jury could find from the evidence that Sheriff Murphy, in screening and hiring Deputy Tingley, was deliberately indifferent to the risk that Deputy Tingley would violate an individual's First or Fourth Amendment rights.

(ii)   Training

The Court now turns to Plaintiffs' theory that Sheriff Murphy was deliberately indifferent with respect to training Deputy Tingley.   To prevail under a theory of supervisory liability for failure to train, Plaintiffs must show that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of [Plaintiffs' constitutional] rights, that [Sheriff Murphy] can reasonably be said to have been deliberately indifferent to the need for additional training."[72]   It is not enough to "show that there were general deficiencies in the county's training program" for sheriff's deputies.[73]   Rather, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to his injury, so that it might be fairly said that the sheriff's training program was both deliberately indifferent to Plaintiffs' constitutional rights and the moving force behind their injury.[74]

---

[71] *Randall v. Bd. of Cty. Comm'rs*, 184 F. App'x 723, 727 (10th Cir. 2006) (quoting *Barrie v. Grand Cty.*, 119 F.3d 862, 869 (10th Cir. 1997)) (internal punctuation omitted).   As Justice Souter noted in his dissent in *Brown*, the deliberate indifference standard articulated by the *Brown* majority "converted a newly-demanding formulation of the standard of fault into a virtually categorical impossibility of showing it in a case like this."  *Brown*, 520 U.S. at 421 (Souter, J., dissenting).  While this sentiment may be somewhat inflated, the fact remains that it is very difficult for a plaintiff to prove deliberate indifference with respect to hiring decisions.

[72] *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (internal quotation omitted).

[73] *Lopez*, 172 F.3d at 760.

[74] *Porro*, 624 F.3d at 1328 (citing *Lopez*, 172 F.3d at 760; *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Plaintiffs first seem to argue that the training Deputy Tingley received while employed by Sheriff Murphy was insufficient. His training "consisted of learning geography and how the Allen County Sheriff's Office works." Of note, Deputy Tingley received no training on "the proof of insurance statute" or "the application of the First Amendment to the crimes of disorderly conduct or interference with law enforcement." Second, Plaintiffs argue that the "need to train" Deputy Tingley "to avoid the violation of constitutional rights was obvious," and Sheriff Murphy's failure to do so was a "deliberate and conscious choice."

Defendants point to additional training that Deputy Tingley received but Plaintiffs chose not to mention. Deputy Tingley graduated from the Kansas Law Enforcement Training Center in 2010 after completing the 560-hour course. His KLETC training included training in the topics of U.S. Constitutional law, Kansas Criminal Law and Code, Criminal Procedure and Laws of Arrest, Kansas Civil and Criminal Liability of Law Enforcement, Introduction to the Kansas Vehicle Code, and Kansas Traffic Code Definitions and Kansas Vehicle Insurance Requirements. After he was hired, he was provided with a copy of the Allen County Sheriff's policies and participated in field training for thirty days with an experienced officer. The policies included an arrest policy which requires either probable cause or a warrant to arrest and a policy of traffic stops.

The Court concludes that the uncontroverted facts do not show that Sheriff Murphy was deliberately indifferent to the need for additional training. First, there is no evidence to suggest that the need for more training was so obvious as to amount to deliberate indifference to the need for additional training.[75] Deputy Tingley had completed the 560 hours of training necessary to

---

[75] *See Jenkins*, 81 F.3d at 994 (holding that, to succeed on a failure to train claim, a plaintiff must prove "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of [Plaintiffs' constitutional] rights, that [the defendant] can reasonably be said to have been deliberately indifferent to the need for additional training.").

qualify for his position.  As a sheriff's deputy, he spent thirty days training on-the-job with an experienced officer.  Sheriff Murphy further provided Deputy Tingley with the Department's policies and procedures, which included policies regarding proper traffic stop and arrest procedures.

Nor was there any evidence which would suggest that the need for different training was so obvious as to amount to deliberate indifference.  As discussed previously, there is no record that Deputy Tingley has ever committed any constitutional violations.  Prior to the night of February 2, 2013, there was no indication that Deputy Tingley needed training on the Kansas proof of insurance statute.  In their argument, Plaintiffs do not cite a specific reason why it would have been obvious that Deputy Tingley was in need of additional training pertaining to "the application of the First Amendment to the crimes of disorderly conduct or interference with law enforcement."  Again, the record does not show that Deputy Tingley has ever violated an individual's First Amendment rights.  Thus there was no obvious need for additional training on the First Amendment.[76]

Accordingly, the Court concludes that no reasonable jury could find "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of [Plaintiffs' constitutional] rights, that [Sheriff Murphy] can reasonably be said to have been deliberately indifferent to the need for additional training."[77]

(iii)   Supervision

Turning now to Plaintiffs' third theory, the Court considers whether Sheriff Murphy's supervision—or lack thereof—amounted to deliberate indifference to Plaintiffs' constitutional

---

[76] *See Carr v. Castle*, 337 F.3d 1221, 1230 (10th Cir. 2003) (holding that failure to train claim fails because the plaintiff "fails to point to any evidence placing the City on actual or constructive notice that the asserted failures to train were substantially certain to result in a constitutional violation.").

[77] *Jenkins*, 81 F.3d at 994.

rights.  "Deliberate indifference requires that the official 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' "[78]  Typically, failure to supervise claims are proven by showing the supervisor was aware or should have been aware of the problem that caused plaintiff's injury and failed to prevent it.[79]  The Court "cannot infer a failure to supervise based solely upon plaintiff's allegation of a constitutional injury."[80]

Plaintiffs failed to present an argument as to why Sheriff Murphy's failure to supervise amounted to deliberate indifference.  It is the Court's best guess that Plaintiffs were trying to articulate this argument in the following paragraph:

> The violations of the Plaintiff's federal rights in this matter were the highly probable and plainly obvious consequence of the Allen County Sheriff's Department's and Defendant Bryan Murphy's actions.  Defendant Bryan Murphy had constructive knowledge of the prior actions, tendencies and behaviors of Deputy Jarod Tingley . . . while employed with the Liberal Police Department.  These prior actions, tendencies and behaviors were well documented in Deputy Jarod Tingley's personnel records at the Liberal Police Department, which Defendant Bryan Murphy intentionally and purposefully failed to seek, even though he knew Tingley had been involuntarily terminated from Liberal prior to his employment with Allen County.

Defendants counter that Sheriff Murphy had no actual knowledge of the alleged complaints about Deputy Tingley at Liberal, but did interview three Liberal officers who had recommended Deputy Tingley for employment.

---

[78] *Serna*, 455 F.3d at 1154–55 (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)).

[79] Michael Avery, David Rudovsky, Karen M. Blum, & Jennifer Laurin, *Police Misconduct: Law & Litigation* § 4:13 (2015).

[80] *Sparks v. Reno Cty. Sheriff's Dep't*, 2004 WL 1664007, at *2 (D. Kan. July 26, 2004); *see also Fields v. Romer*, 232 F.3d 901, 2000 WL 1616394, at *2 (10th Cir. Oct. 30, 2000) (finding allegation that supervisory officials were ultimately responsible for wrongful conduct of subordinates inadequate to establish liability under § 1983).

Here, Plaintiffs are unable to show that Sheriff Murphy's supervision of Deputy Tingley amounted to deliberate indifference to their constitutional rights.   The uncontroverted facts establish that Sheriff Murphy had no knowledge of the alleged complaints about Deputy Tingley at Liberal.   Even if Sheriff Murphy had full knowledge of Deputy Tingley's personnel record, the alleged pattern of misconduct is plainly insufficient to provide "notice of the substantial likelihood that a constitutional injury will occur."[81]   In Deputy Tingley's multiple years working as a law enforcement officer, Plaintiffs are only able to point to two incidents that even remotely implicate First or Fourth Amendment violations.   Yet, no complaints or lawsuits were filed. These incidents fail to even give rise to the inference that a risk of harm existed.   If they did give rise to such an inference, they certainly do not support the inference "that a *substantial* risk of *serious* harm" existed.[82]

Accordingly, the Court concludes that no reasonable jury could find that Sheriff Murphy's supervision of Deputy Tingley amounted to deliberate indifference.

The evidence fails to affirmatively link Plaintiffs' constitutional injuries to Sheriff Murphy under all three of Plaintiffs' theories of supervisory liability.   No reasonable jury could find that Sheriff Murphy acted with deliberate indifference when hiring, training, or supervising Deputy Tingley.   Therefore, the Court grants summary judgment with respect to all claims against Sheriff Murphy in his individual capacity.

## 2. *Municipal Liability for the Board & Sheriff Murphy in his Official Capacity*

John and Mitchell Sigg brought their claims under § 1983 alleging that Deputy Tingley violated their rights protected by the First and Fourth Amendments to the United States

---

[81] *Sigg v. Bd. of Cty. Comm'rs*, 1999 WL 588186, at *5 (D. Kan. July 30, 1999) (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

[82] *Serna*, 455 F.3d at 1154–55 (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)) (emphasis added).

Constitution.  Plaintiffs contend that both the Board and Sheriff Murphy (in his official capacity) are liable for those violations because Deputy Tingley should not have been hired, and after he began employment he was insufficiently trained and supervised.   The Tenth Circuit has established that "a suit against [Sheriff Murphy] in his official capacity as sheriff is the equivalent of a suit against [the Allen County Board of County Commissioners].[83]   Thus, the Court will apply the same analysis to Plaintiffs' claims against Sheriff Murphy in his official capacity as to their claims against the Board.

In contrast to individual supervisor liability, the Tenth Circuit has explained that nothing in *Iqbal* changed the "longstanding interpretation" of § 1983's standards for imposing municipal liability.[84]   That interpretation dates back to *Monell*, which held that a plaintiff must identify "a government's policy or custom" that caused the injury.[85]   In later cases, the Supreme Court required a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.[86]   The Court will briefly discuss each of the three elements: (1) official policy or custom, (2) causation, and (3) state of mind.[87]

a.  Official Policy or Custom

In *Monell*, the Supreme Court stated that "Congress did not intend for municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."[88]   "[I]t is when execution of a government's policy or custom, whether made

---

[83] *Lopez*, 172 F.3d at 762; *see also Myers v. Ok. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998).

[84] *Schneider*, 717 F.3d at 769.

[85] *Monell*, 436 U.S. at 691–92.

[86] *See Brown*, 520 U.S. at 403; *see also City of Canton*, 489 U.S. at 389.

[87] *Schneider*, 717 F.3d at 769.

[88] *Monell*, 436 U.S. at 691.

by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[89]

"The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."[90]  "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision."[91]

In this case, Plaintiffs simply assert that the "need to train Deputy Jarod Tingley to avoid the violation of constitutional rights was obvious, and Defendant Bryan Murphy's failure to do so was a deliberate and conscious choice amounting to a policy under case law."  The "case law" Plaintiffs cite are two Supreme Court cases: *Monell* and *City of Canton*.

*Monell* does not particularly support Plaintiffs' argument as it did not address whether the failure to adequately train an employee could amount to a policy under case law.  It merely established the concept of municipal liability in the context of § 1983 claims.  In *City of Canton*, the Supreme Court held, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."[92]

---

[89] *Id.* at 694.

[90] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

[91] *Schneider*, 717 F.3d at 770; *see also* Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.06[A] (2016).

[92] 489 U.S. at 389.

Above, in discussing supervisory liability, the Court concluded that the uncontroverted facts could not show that Sheriff Murphy's failure to provide Deputy Tingley with additional training amounted to deliberate indifference.  There was no obvious need to provide Deputy Tingley with additional training, and his history did not indicate a high likelihood of future constitutional violations.  Thus, the failure to train Deputy Tingley is insufficient to satisfy the official policy or custom element of municipal liability.  Plaintiffs offer no alternative theories for what could constitute an official policy or custom.  Additionally, Plaintiffs do not argue in the alternative that the Board acted with deliberate indifference if Sheriff Murphy did not.

Thus, the evidence does not show that there was an official policy or custom necessary to impose municipal liability on either the Board or Sheriff Murphy.

b.  Causation

In addition to failing to show a custom or policy, Plaintiffs also fail to show any evidence of causation.  To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiff's federal protected right."[93]  This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged."[94]

Plaintiffs must therefore "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[95]  As with so-called supervisory liability discussed above, municipal liability in a § 1983 case cannot be established on a theory of vicarious liability.[96]  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but

---

[93] *Schneider*, 717 F.3d at 770 (quoting Schwartz, at § 7.12[B]).

[94] *Brown*, 520 U.S. at 404.

[95] *Id.*

[96] *Schneider*, 717 F.3d at 770.

nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."[97]  "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."[98]

In this case, Plaintiffs cannot establish a causal link between the custom or policy and the alleged violation of the Siggs' constitutional rights because they were unable to show the existence of a custom or policy.  Without a custom or policy, there can be no causal link to the alleged conduct.

Accordingly, Plaintiffs fail to present any evidence necessary to establish causation.

c.  State of Mind

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[99]

The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct.  In a narrow range of circumstances, however, deliberate indifference may be found

---

[97] *Brown*, 520 U.S. at 405.

[98] *Schneider*, 717 F.3d at 770 (quoting Schwartz, at § 7.12).

[99] *Brown*, 520 U.S. at 407; *see also City of Canton*, 489 U.S. at 389.

absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction.[100]

The Court concludes that the evidence fails to affirmatively link Plaintiffs' constitutional injuries to Sheriff Murphy under all three of Plaintiffs' theories of supervisory liability.  Sheriff Murphy did not act with deliberate indifference when hiring, training, or supervising Deputy Tingley.

*3.  Conclusion*

In sum, the Court concludes that the uncontroverted evidence cannot support a claim for § 1983 liability under the theories of supervisory or municipal liability.  The Board and Sheriff Murphy, in both his individual and official capacities, cannot be held liable even if Deputy Tingley had violated John and Mitchell Sigg's constitutional rights.  Therefore, the Court will grant summary judgment with respect to all claims against the Board and Sheriff Murphy in his official capacity.

**B.  Plaintiffs' Motions for Summary Judgment and Defendants' Remaining Arguments**

Because the Court grants Defendants' motion for summary judgment, it is not necessary to address Plaintiffs' motions for summary judgment and decide whether Deputy Tingley did, in fact, violate John and Mitchell Sigg's rights.  Because the Court has granted summary judgment with respect to all claims against Defendants, there is no need for the Court to determine whether Deputy Tingley—a non-party—violated the Siggs' constitutional rights.

The Court also declines to address Defendants' remaining arguments.  The Court has already determined that Sheriff Murphy cannot be held liable in his individual capacity, thus it

---

[100] *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998).

would be redundant to grant him qualified immunity as well.  There is also no need to determine whether the Board is the employer of Deputy Tingley under Kansas law.

### IV.     Conclusion

For the reasons state above, the Court grants Defendants' motion for summary judgment, and denies as moot both of the Siggs' motions for partial summary judgment.  The Court grants Defendants' motion for summary judgment because the evidence shows that the Board and Sheriff Murphy did not act with deliberate indifference with respect to the hiring, training, or supervision of Deputy Tingley.  Therefore, the Board and Sheriff Murphy, in both his individual and official capacities, cannot be held liable for the alleged violations of Plaintiffs' constitutional rights.  Finally, the Court denies both Plaintiffs' motions for partial summary judgment because it is not necessary to determine whether their constitutional rights were violated.

**IT IS THEREFORE ORDERED** that the Defendants' Motion for Summary Judgment (Doc. 45) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff John M. Sigg's Motion for Partial Summary Judgment (Doc. 41) and Plaintiff Mitchell Sigg's Motion for Partial Summary Judgment (Doc. 42) are **DENIED.**

**IT IS SO ORDERED.**

Dated this 15th day of November, 2016.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE